UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

**PNC BANK, NATIONAL ASSOCIATION,**

      Plaintiff,

vs.                               Case No. _____

**CASALE MARBLE IMPORTS, INC.,** a
Florida corporation, **DONATO W.
CASALE,** an individual, **SYLVANA C.
CASALE,** an individual, **COMMERCIAL
REAL ESTATE INVESTMENT GROUP
CORP.,** a Florida corporation, **METRO &
SIVAN, LLC,** a Florida limited liability
company, **BOCA RATON BATH &
TENNIS CLUB, INC.,** a Florida nonprofit
corporation, **LA CASA HOMEOWNERS
ASSOCIATION, INC.,** a Florida nonprofit
corporation, **BEL-AIRE HOMEOWNERS
ASSOCIATION OF PALM BEACH
COUNTY, INC.,** a Florida nonprofit
corporation, **TRITON STONE OF FORT
MYERS LLC,** a/k/a **TRITON STONE
GROUP OF FORT MYERS, LLC,** a
Florida limited liability company,
**ROBERT CASE,** an individual, and any
**UNKNOWN TENANTS,**

      Defendants.

_____/

## VERIFIED COMPLAINT

    Plaintiff, PNC Bank, National Association ("PNC"), sues the Defendants, CASALE

MARBLE IMPORTS, INC., a Florida corporation ("CASALE MARBLE"), DONATO W.

CASALE, an individual ("D. CASALE"), SYLVANA C. CASALE, an individual

("S. CASALE"). COMMERCIAL REAL ESTATE INVESTMENT GROUP CORP., a Florida

corporation ("CREIG"), METRO & SIVAN, LLC, a Florida limited liability company

("METRO"), BOCA RATON BATH & TENNIS CLUB, INC., a Florida corporation ("BOCA

RATON"), LA CASA HOMEOWNERS ASSOCIATION, INC., a Florida corporation ("LA

CASA"), BEL-AIRE HOMEOWNERS ASSOCIATION OF PALM BEACH COUNTY, INC., a

Florida corporation ("BEL-AIRE"), TRITON STONE OF FORT MYERS LLC, a/k/a TRITON

STONE GROUP OF FORT MYERS, LLC, a Florida limited liability company ("TRITON"),

ROBERT CASE, an individual ("CASE"), and any UNKNOWN TENANTS ("UNKNOWN

TENANTS"), and alleges:

<u>**PARTIES, JURISDICTION AND VENUE**</u>

     1.     PNC is a national banking association and for purposes of diversity, is a citizen of

Delaware pursuant to its charter, with its principal place of business in Pennsylvania.

     2.     Defendant CASALE MARBLE is a Florida corporation with its principal address

at 750 SW 17th Avenue, Delray Beach, Florida 33444.

     3.     Defendant CREIG is a Florida corporation with its principal address at 751 SW

17th Avenue, Delray Beach, Florida 33444.

     4.     Defendant METRO is a Florida limited liability company with its principal

address at 4801 Linton Blvd., Delray Beach, Florida 33445.   METRO's sole member is

D. CASALE who is a citizen of the state of Florida residing in Palm Beach County.

     5.     D. CASALE is a citizen of Florida, residing in Palm Beach County and is a

principal of CASALE MARBLE, METRO and CREIG.

     6.     S. CASALE is a citizen of Florida, residing in Palm Beach County.

     7.     Defendant BOCA RATON is a Florida nonprofit corporation with its principal

address at 2801 North Military Trail, Boca Raton, Florida 33431-6316.

8.      Defendant LA CASA is a Florida nonprofit corporation with its principal address at 300 El Prado, Venice, Florida 34287.

9.      Defendant BEL-AIRE is a Florida nonprofit corporation with its principal address at 5121 Casa Real Drive, Delray Beach, Florida 33484.

10.     Defendant TRITON is a Florida limited liability company with its principal address at 3531 Metro Parkway, Fort Myers, Florida  33916.  Upon information and belief, TRITON's members are Joseph Faulkenberry, a citizen of Mississippi residing in Benton County, Mississippi; Randy Mathis, a citizen of Tennessee residing in Shelby County, Tennessee; and Josh Kessler, a citizen of Florida residing in Broward County, Florida.

11.     Defendant CASE, upon information and belief, is a citizen of Ney York residing in Suffolk County, Florida.

12.     The Court has jurisdiction of this matter because the amount in controversy is greater than $75,000, exclusive of fees and costs and complete diversity exists between PNC on the one hand and the Defendants on the other, pursuant to U.S.C. s 1332(a), as no Defendant is a citizen of Delaware or Pennsylvania.

13.     Venue is proper pursuant to 28 U.S.C. s 1391(b).

14.     All conditions precedent to this action have been met, waived or have otherwise been satisfied.

## CASALE MARBLE LOANS

### General Allegations as to the CASALE MARBLE 2005 Loan

15.     On March 8, 2005, CASALE MARBLE entered into a Business Loan Agreement (Asset Based), pursuant to which RBC agreed to extend credit to CASALE MARBLE (the "2005

Loan Agreement"). A copy of the 2005 Loan Agreement, is attached hereto and incorporated herein as **Exhibit "A"**.

16.     On or about March 8, 2005, CASALE MARBLE, as evidence of the loan made by RBC (the "2005 Loan"), executed and delivered to RBC a Promissory Note dated March 8, 2005, in the principal amount of $5,000,000.00 (the "2005 Note"). A copy of the 2005 Note is attached hereto and incorporated herein as **Exhibit "B"**.

17.     To secure payment of the 2005 Note, CASALE MARBLE on or about March 8, 2005, executed a Commercial Security Agreement wherein CASALE MARBLE pledged all inventory, chattel paper, accounts, equipment, general intangibles, furniture and fixtures (the "2005 Collateral") of CASALE MARBLE as security for all loans to CASALE MARBLE (the "2005 Commercial Security Agreement"). A copy of the 2005 Commercial Security Agreement is attached hereto and incorporated herein as **Exhibit "C"**.

18.     To further secure payment of the 2005 Note, on or about March 8, 2005, CREIG executed and delivered a Commercial Guaranty to RBC (the "CREIG Guaranty"). A copy of the CREIG Guaranty is attached hereto and incorporated herein as **Exhibit " D"**.

19.     To further secure payment of the 2005 Note, on or about March 8, 2005, CASALE, executed and delivered a Commercial Guaranty to RBC (the "2005 D. CASALE Guaranty"). A copy of the 2005 D. CASALE Guaranty is attached hereto and incorporated herein as **Exhibit "E"**.

20.     To further secure payment of the 2005 Note from CASALE MARBLE, RBC filed UCC-1 Financing Statements with the Secretary of State, State of Florida, bearing file number 200509251658, and recorded a UCC-1 Financing Statement in Official Records Book 18315, Page 1699, of the Public Records in and for Palm Beach County, Florida, which was continued

1934736 v2

by that certain UCC-3 Financing Statement, filed with the Secretary of State, State of Florida bearing file number 201308977830 and in Official Records Book 26012, Page 1786 of the Public Records in and for Palm Beach County, Florida (the "Casale 2005 UCC's") evidencing its interest in the Collateral as set forth in the 2005 Commercial Security Agreement.  Copies of said Casale 2005 UCC's are attached hereto and incorporated herein as **Composite Exhibit "F"**.

21.    On September 14, 2006, CASALE MARBLE entered into a First Amendment to Loan Agreement with RBC amending the loan agreement to modify the financial covenants on EBITDA and tangible net worth (the "First Amendment to Loan Agreement").  A copy of the First Amendment to Loan Agreement is attached hereto and incorporated herein as **Exhibit "G"**.

22.    On May 1, 2007, CASALE MARBLE entered into a Second Amendment to Loan Agreement with RBC amending the loan agreement to again modify the financial covenants on EBITDA and tangible net worth (the "Second Amendment to Loan Agreement").  A copy of the Second Amendment to Loan Agreement is attached hereto and incorporated herein as **Exhibit "H"**.

23.    On May 29, 2007, CASALE MARBLE entered into a Change in Terms Agreement with RBC extending the maturity date of the loan to June 1, 2008 and increasing the amount of the loan to $8,000,000.00 (the "Change in Terms Agreement").  A copy of the Change in Terms Agreement is attached hereto and incorporated herein as **Exhibit "I"**.

24.    On May 29, 2007, CASALE MARBLE entered into a Business Loan Agreement (Asset Based) pursuant to which RBC agreed to extend further credit to CASALE MARBLE (the "2007 Loan Agreement").  A copy of the 2007 Loan Agreement is attached hereto and incorporated herein as **Exhibit "J"**.

1934736 v2

## General Allegations as to the CASALE MARBLE 2006 Loan

25. On or about January 20, 2006, CASALE MARBLE, as evidence of the loan made by RBC (the "First 2006 Loan"), executed and delivered to RBC a Promissory Note dated January 20, 2006, in the principal amount of $1,000,000.00 (the "2006 First Note"). A copy of the 2006 First Note is attached hereto and incorporated herein as **Exhibit "K"**.

26. To secure payment of the 2006 First Note, CASALE MARBLE executed on or about January 20, 2006, a Commercial Security Agreement wherein CASALE MARBLE again pledged all inventory, chattel paper, accounts, equipment, general intangibles, furniture and fixtures (the "First 2006 Collateral") of CASALE MARBLE as security for all loans to CASALE MARBLE (the "First 2006 Commercial Security Agreement"). A copy of the First 2006 Commercial Security Agreement is attached hereto and incorporated herein as **Exhibit "L"**.

## General Allegations as to the CASALE MARBLE 2006 Second Loan

27. On or about January 26, 2006, CASALE MARBLE, as evidence of the loan made by RBC (the "Second 2006 Loan"), executed and delivered to RBC a Promissory Note dated January 26, 2006, in the principal amount of $280,000.00 (the "2006 Second Note"). A copy of the 2006 Second Note is attached hereto and incorporated herein as **Exhibit "M"**.

28. To secure payment of the 2006 Second Note, CASALE MARBLE executed on or about January 26, 2006, a Commercial Security Agreement wherein CASALE MARBLE pledged an Edge Polishing Machine Model Omega 100 Serial number 09706 and a HTO-1B Bridge Saw with cutting area 140' X 140" (the "Second 2006 Collateral") of CASALE MARBLE as security for the loan to CASALE MARBLE (the "Second 2006 Commercial Security Agreement"). A copy of the Second 2006 Commercial Security Agreement is attached hereto and incorporated herein as **Exhibit "N"**.

29.     To further secure payment of the 2006 Second Note, on or about January 26, 2006, D. CASALE, executed and delivered a Commercial Guaranty to RBC (the "2006 D. CASALE Guaranty").   A copy of the 2006 D. CASALE Guaranty is attached hereto and incorporated herein as **Exhibit "O"**.

30.     To further secure payment of the 2006 Second Note to CASALE MARBLE, RBC filed UCC-1 Financing Statements with the Secretary of State, State of Florida, bearing file number 200601774688, as continued by that certain UCC-3 Financing Statement filed with the Secretary of State, State of Florida, bearing file number 20100300121X (collectively the "Casale 2006 UCC's") evidencing its interest in the Second 2006 Collateral as set forth in the Commercial Security Agreement.   Copies of said Casale 2006 UCC's are attached hereto and incorporated herein as **Composite Exhibit "P"**.

## General Allegations as to the CASALE MARBLE 2007 First Loan

31.     On or about January 4, 2007, CASALE MARBLE, as evidence of the loan made by RBC   (the "First 2007 Loan"), executed and delivered to RBC a Promissory Note dated January 4, 2007, in the principal amount of $232,437.00 (the "2007 First Note").   A copy of the 2007 First Note is attached hereto and incorporated herein as **Exhibit "Q"**.

32.     To secure payment of the 2007 First Note, CASALE MARBLE executed on or about January 4, 2007, a Commercial Security Agreement wherein CASALE MARBLE again pledged all inventory, chattel paper, accounts, equipment, general intangibles, furniture and fixtures of CASALE MARBLE (the "First 2007 Collateral") as security for all loans to CASALE MARBLE (the "First 2007 Commercial Security Agreement").   A copy of the First 2007 Commercial Security Agreement is attached hereto and incorporated herein as **Exhibit "R"**.

1934736 v2

33.     To further secure payment of the 2007 First Note, on or about January 4, 2007, D. CASALE, executed and delivered a Commercial Guaranty to RBC (the "2007 D. CASALE Guaranty").   A copy of the 2007 D. CASALE Guaranty is attached hereto and incorporated herein as **Exhibit "S"**.

### General Allegations as to the CASALE MARBLE 2007 Second Loan

34.     On or about August 17, 2007, CASALE MARBLE, as evidence of the loan made by RBC  (the "2007 Second Loan"), executed and delivered to RBC a Promissory Note dated August 17, 2007, in the principal amount of $621,850.00 (the "2007 Second Note").   A copy of the 2007 Second Note is attached hereto and incorporated herein as **Exhibit "T"**.

35.     To secure payment of the 2007 Second Note, CASALE MARBLE executed on or about August 17, 2007, a Commercial Security Agreement wherein CASALE MARBLE pledged the following:

| Vehicle | Year | Make | Model | Vehicle Identification No. |
|---|---|---|---|---|
| 1 | 1999 | Freightliner | FLD-120 Single Axle | 1FUWDSEA7XLB87530 |
| 2 | 1999 | Freightliner | Convention Single Axle | 1FUWDZYA4XLB01059 |
| 3 | 1997 | Volvo | WG4T Single Axle Tractor | 4VAJBAPE4VN857357 |
| 4 | 1998 | Isuzu | FTR-10 Truck | 4GTJ7C120WJ600035 |
| 5 | 1998 | Intl | 4700 GVSD97-24 Aluminum Van | 1HTSCABM7WH554803 |
| 6 | 1999 | Intl | 8100 | 1HTHCAHR6XH671576 |
| 7 | 1985 | GDAN | Trailer | 1GRJM8425FM049513 |
| 8 | 1985 | GDAN | Trailer | 1GRJM8429FM049515 |
| 9 | 1985 | FRUE | Trailer | 1H4P04222GF001614 |
| 10 | 1988 | FRUE | Trailer | 1H2V04526JE021311 |
| 11 | 1987 | GDAN | Trailer | 1GRDM9021HM057216 |

And certain specific equipment:   Omar #2 2005 Capacity 12 Ton-Crane Model OR12000S88, 2001 HTO – 1B Bridge Saw s/n 5865, 2003 HTO-1B Bridge Saw s/n 6460, 2006 HTO-1B Bridge Saw s/n 6993, 2006 Wet Saw – Emmedue 3000 Saw, s/n 0601002, 2006 Metal Transport Carts, (Metal Supply and Machining), 2006 Shop Hoist #205345, 2006 Engine Analyzer s/n MFE52548237, 2006 Air Compressor s/n 1232 part 100975.0, 2007 Saylor Beall Air Compressor Model VT73580, 2006 Tire Balancing Machine Model

1934736 v2

5200S, 2006 Tire Changer/Hoffman Deo 80/AMMCO 4000 Mechanic Shop, 2006 Wooley

Shed 8X12 Construction OFC Trailer Serial 2919 ID 182554, 2007 Woolery Shed 8X12-

MK s/n 6040, 2006 Equipment/Toll Storage Trailer Model 824TD Cargo-W, Equipment

Trailer LDP 207T5L8PH202071010236, 2006 Toyota Forklift Model-7FGU25-81100,

2006 Toyota Forklift s/n 7FGU25FSV, 2006 644D/34 Telescoping Forklift s/n 24795,

2007 Toyota Forklift NLT#18067 s/n 8FGU25-10356, 2007 Princeton-Teledune Piggyback

Model #Z-2-3 ID# MP213671C s/n 1125, Two water Jet Cutting Systems Model Accura

610 s/n MH0847 and MH 0850, E50 KMT High Pressure 50hp pump,

(the "Second 2007 Collateral") of CASALE MARBLE as security for all loans to CASALE

MARBLE (the "Second 2007 Commercial Security Agreement").  A copy of the Second 2007

Commercial Security Agreement is attached hereto and incorporated herein as **Exhibit "U"**.

36.     To further secure payment of the 2007 Second Note to CASALE MARBLE, RBC

filed UCC-1 Financing Statements with the Secretary of State, State of Florida, bearing file

number 200706496831, as continued by that certain UCC-3 Financing Statement filed with the

Secretary of State, State of Florida, bearing file number 20120722599X (collectively the "Casale

2007 UCC's") evidencing its interest in the Second 2007 Collateral as set forth in the Second

2007 Commercial Security Agreement.  Copies of said 2007 Casale UCC's are attached hereto

and incorporated herein as **Composite Exhibit "V"**.

### General Allegations as to the 2010 CASALE MARBLE Modification

37.     On June 14, 2008, CASALE MARBLE filed a petition for relief under Chapter 11

of the Bankruptcy Code in the United States Bankruptcy Court, Southern District of Florida,

Palm Beach Division, Case No. 08-19689-BKC-PGH (the "Bankruptcy Case").

38.     On June 30, 2010, CASALE MARBLE filed its First Amended Plan of Reorganization (the "Plan").   The Plan contemplated a modification of the various CASALE MARBLE loans.  A copy of the Plan is attached hereto and incorporated herein as **Exhibit "W"**.

39.     By order dated August 26, 2010, the Court confirmed the Chapter 11 Plan of Reorganization proposed by CASALE MARBLE (the "Confirmation Order").   A copy of the Confirmation Order is attached hereto and incorporated herein as **Exhibit "X"**.

40.     Pursuant to the terms of the Plan and effective as of October 1, 2010, RBC, CASALE MARBLE, CREIG and CASALE entered into that certain Loan Modification Agreement (the "Loan Modification Agreement").   Pursuant to the terms of the Loan Modification Agreement, the Plan, the Confirmation Order, the 2006 First Loan, the 2006 Second Loan, the 2007 First Loan, and the 2007 Second Loan were renewed and consolidated into a single obligation, to be referred to as the "Consolidated Loan".  A copy of the Loan Modification Agreement is attached hereto and incorporated herein as **Exhibit "Y"**.

41.     As part of the 2010 modification and in connection with the Consolidated Loan, CASALE MARBLE executed and delivered to RBC that certain Consolidated Renewal Promissory Note in the original principal amount of $1,231,054.33 (the "Consolidated Renewal Promissory Note"). A copy of the Consolidated Renewal Promissory Note is attached hereto and incorporated herein as **Exhibit "Z"**.

42.     Effective March 2, 2012, RBC Bank (USA) merged into PNC.  A copy of the articles of merger are attached hereto and incorporated herein as **Exhibit "AA"**.

43.     As successor to RBC Bank (USA), PNC is the owner and holder of the 2005 Loan Agreement, the First Amendment to Loan Agreement, the Second Amendment to Loan Agreement, the Change in Terms Agreement, the 2005 Note, the 2005 Commercial Security

1934736 v2

Agreement, 2006 First Note,  the First 2006 Commercial Security Agreement, the 2006 Second Note, the Second 2006 Commercial Security Agreement, the 2007 First Note, the First 2007 Commercial Security Agreement, the 2007 Second Note, the Second 2007 Commercial Security Agreement, the 2005 D. CASALE Guaranty, the 2006 D. CASALE Guaranty, the 2007 D. CASALE Guaranty, the Loan Modification Agreement, 2007 Loan Agreement, the Consolidated Renewal Promissory Note, the CREIG Guaranty, the Casale 2005 UCC's, the Casale 2006 UCC's, and the Casale 2007 UCC's (collectively, the "Casale Marble Loan Documents").

## THE CREIG LOAN

44.     On or about April 12, 2006, CREIG entered into a Loan Agreement (Secured), pursuant to which RBC agreed to extend credit to CREIG (the "CREIG Loan Agreement").  A copy of the CREIG Loan Agreement is attached hereto and incorporated herein as **Exhibit "BB"**.

45.     On or about April 12, 2006, CREIG, as evidence of the loan made by RBC  (the "CREIG Loan"), executed and delivered to RBC a Promissory Note dated April 12, 2006, in the principal amount of $3,088,882.33 (the "CREIG Note").  A copy of the CREIG Note is attached hereto and incorporated herein as **Exhibit "CC"**.

46.     To secure payment of the CREIG Note, on April 12, 2006 CREIG, D. CASALE, and S. CASALE executed and delivered to RBC a Mortgage and Loan Documents Modification, Notice of Future Advance and Spreader Agreement (the "CREIG Mortgage"), which mortgage covering three separate properties was recorded in Official Records Book 20209, Page 1794, et seq., Public Records of Palm Beach County, Florida.  A copy of the CREIG Mortgage is attached hereto and incorporated herein as **Exhibit "DD"**.

1934736 v2

47.     To further secure payment of the CREIG Note, on April 12, 2006 CREIG executed and delivered to RBC an Assignment of Leases, Rents and Profits (the "CREIG Assignment of Rents"), which assignment was recorded in Official Records Book 20209, Page 1822, Public Records of Palm Beach County, Florida.  A copy of the CREIG Assignment of Rents is attached hereto and incorporated herein as **Exhibit "EE"**.

48.     To further secure payment of the CREIG Note, on April 12, 2006, D. CASALE executed and delivered an Unconditional Guaranty Agreement to RBC (the "CREIG-Casale Guaranty").  A copy of the CREIG-Casale Guaranty is attached hereto and incorporated herein as **Exhibit "FF"**.

49.     To further secure payment of the CREIG Note to CREIG, RBC filed UCC-1 Financing Statements with the Secretary of State, State of Florida, bearing file numbers 200602444967 and 200602444975, and recorded UCC-1s Financing Statement in Official Records Book 20209, Page 1834 *et seq.*, and Book 20209, Page 1839 *et seq.*, of the Public Records in and for Palm Beach County, Florida, as continued by that certain UCC-3 Financing Statement filed with the Secretary of State, State of Florida, bearing file numbers 201308977830, and recorded in Official Records Book 26012, Page 1786 *et seq.*, of the Public Records in and for Palm Beach County, Florida (the "CREIG UCC's"), evidencing its interest in the CREIG Mortgage.  Copies of the CREIG UCC's are attached hereto and incorporated herein as **Composite Exhibit "GG"**.

50.     Furthermore, CREIG, RBC and D. CASALE entered into that certain Loan Modification Agreement (the "First 2010 CREIG Modification") and that certain Loan Modification Agreement (the "Second 2010 CREIG Modification"), both of which are dated October 1, 2010, and pursuant to which the maturity date on the CREIG Note was further

1934736 v2

extended to October 29, 2010, and then September 30, 2013, respectively.  Copies of the First 2010 CREIG Modification and the Second 2010 CREIG Modification are attached hereto and incorporated herein as **Composite Exhibit "HH"**.

51.     As successor to RBC Bank (USA), PNC is the owner and holder of the CREIG Loan Agreement, the CREIG Note, the CREIG Mortgage, the CREIG Assignment of Rents, the CREIG UCC's, the First 2010 CREIG Modification, the Second 2010 CREIG Modification, and the CREIG-Casale Guaranty (the "CREIG Loan Documents").

### THE METRO LOANS

### The First Metro Loan

52.     On or about August 25, 2005, METRO entered into a Business Loan Agreement, pursuant to which RBC agreed to extend credit to METRO (the "First Metro Loan Agreement"). A copy of the First Metro Loan Agreement is attached hereto and incorporated herein as **Exhibit "II"**.

53.     On or about August 25, 2005, METRO, as evidence of the loan made by RBC (the "First Metro Loan"), executed and delivered to RBC a Promissory Note dated August 25, 2005, in the principal sum of $1,260,000.00 (the "First Metro Note").  A copy of the First Metro Note is attached hereto and incorporated herein as **Exhibit "JJ"**.

54.     To secure payment of the Metro Note, on August 25, 2005, METRO executed and delivered to RBC a Mortgage Future Advances (the "First Metro Mortgage"), which was recorded on October 4, 2005 as Instrument No. 2005000051205.  A copy of the First Metro Mortgage is attached hereto and incorporated herein as **Exhibit "KK"**.

55.     To further secure payment of the Metro Note, on August 25, 2005, METRO executed and delivered to RBC an Assignment of Rents (the "First Metro Assignment"), which

was recorded on October 4, 2005 as Instrument No. 2005000051206. A copy of the First Metro Assignment is attached hereto and incorporated herein as **Exhibit "LL"**.

56.    To further secure payment of the First Metro Note, on August 25, 2005, D. CASALE executed and delivered a Commercial Guarantee to RBC (the "Metro-Casale Guaranty"). A copy of the Metro-Casale Guaranty is attached hereto and incorporated herein as **Exhibit "MM"**.

<u>**The Second Metro Loan**</u>

57.    On or about September 11, 2006, as evidence of a loan made by RBC (the "Second Metro Loan"), METRO executed and delivered to RBC a Promissory Note dated September 11, 2006 in the principal amount of $842,000.00 (the "Second Metro Note"). A copy of the Second Metro Note is attached hereto and incorporated herein as **Exhibit "NN"**.

58.    To secure payment of the Second Metro Note, on September 11, 2006, METRO executed and delivered to RBC a Mortgage Future Advances (the "Second Metro Mortgage"), which was recorded as Instrument No. 2006000355850. A copy of the Second Metro Mortgage is attached hereto and incorporated herein as **Exhibit "OO"**.

59.    To further secure payment of the Second Metro Note, on September 11, 2006, METRO executed and delivered to RBC an Assignment of Rents (the "Second Metro Assignment"), which was recorded as Instrument No. 2006000355851. A copy of the Second Metro Assignment is attached hereto and incorporated herein as **Exhibit "PP"**.

60.    By that certain Change in Terms Agreement dated November 29, 2006 (the "First Change in Terms Agreement"), RBC extended the maturity date on the Second Metro Loan to November 11, 2011. A copy of the First Change in Terms Agreement is attached hereto and incorporated herein as **Exhibit "QQ"**.

61.     By that certain Change in Terms Agreement dated January 26, 2007, RBC extended the maturity date on the Second Metro Loan to December 11, 2011 (the "Second Change in Terms Agreement"). A copy of the Second Change in Terms Agreement is attached hereto and incorporated herein as **Exhibit "RR".**

62.     In connection with the Second Change in Terms Agreement, Metro executed and delivered to RBC that certain Business Loan Agreement dated January 26, 2007 (the "Second Metro Loan Agreement"). A copy of the Second Metro Loan Agreement is attached hereto and incorporated herein as **Exhibit "SS".**

63.     By that certain Change in Terms Agreement dated February 13, 2007, RBC extended the maturity date of the Second Metro Loan to January 11, 2012 (the "Third Change in Terms Agreement"). A copy of the Third Change in Terms Agreement is attached hereto and incorporated herein as **"Exhibit "TT".**

64.     Furthermore, METRO, RBC and D. CASALE entered into that certain Loan Modification Agreement (the "First 2010 Metro Modification") and that certain Loan Modification Agreement (the "Second 2010 Metro Modification"), both of which are dated October 1, 2010, and pursuant to which the maturity date on the CREIG Note was further extended to October 29, 2010, and then September 30, 2013, respectively. Copies of the First 2010 Metro Modification and the Second 2010 Metro Modification are attached hereto and incorporated herein as **Composite Exhibit "UU".**

65.     As successor to RBC Bank (USA), PNC is the owner and holder of the First Metro Loan Agreement, the First Metro Note, the First Metro Mortgage, the First Metro Assignment, the Metro-Casale Guaranty, the Second Metro Note, the Second Metro Mortgage, the Second Metro Assignment, the First Change in Terms Agreement, the Second Change in

Terms Agreement, the Second Metro Loan Agreement, the Third Change in Terms Agreement, the First 2010 Metro Modification, and the Second 2010 Metro Modification (collectively, the "Metro Loan Documents," and together with the Casale Marble Loan Documents and the CREIG Loan Documents, the "Loan Documents").

**Cross-Default and Cross-Collateralization**

66.     To further secure payment of all obligations, PNC, CASALE MARBLE, CREIG, METRO and D. CASALE executed that certain Cross Default and Cross Collateralization Agreement (the "Cross Collateralization Agreement").  A copy of the Cross Collateralization Agreement is attached hereto and incorporated herein as **Exhibit "VV"**.

67.     Pursuant to the terms of the Cross Collateralization Agreement, a default under any of the loans identified above operates as a default under each of the other loans.  In addition, any property pledged for the CASALE MARBLE loans, the CREIG loan and the Metro loan all operates as collateral for the other loans.

**The Defaults on All Loans**

68.     CASALE MARBLE is in default under the Loan Documents by failing to make payments due on March 1, 2012, and all payments due thereafter.

69.     CREIG is in default under the Loan Documents by failing to make the payment due on March 1, 2012 and all payments due thereafter.

70.     CREIG is further in default under the Loan Documents for failing to pay 2012 real estate taxes on the properties which secure the CREIG Loan.

71.     METRO is in default under the Loan Documents by failing to make payments due on March 1, 2012, and all payments due thereafter.

1934736 v2

72.     METRO is further in default under the Loan Documents for failing to pay 2012 real estate taxes on the properties which secure the METRO Loan.

73.     Pursuant to the Cross Collateralization Agreement, a default by CASALE MARBLE, CREIG, or METRO on any of their respective loans is a default under all their respective loans, and therefore CASALE MARBLE, CREIG, and METRO are in further default on account each other's respective defaults.

74.     By letter dated April 26, 2013, PNC notified CASALE MARBLE, D. CASALE, METRO, and CREIG (the "Demand Letter") that CASALE MARBLE, D. CASALE, METRO, and CREIG were in default under the Loan Documents and demanded that PNC be paid the full amount of the debt due under the Loan Documents. A copy off the Demand Letter is attached hereto and incorporated herein as **Exhibit "WW"**.

75.     Although demand has been made, CREIG, METRO, CASALE MARBLE, and D. CASALE have failed to pay PNC.

## COUNT I
## (PROMISSORY NOTE - 2005 NOTE)

76.     Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

77.     CASALE MARBLE has defaulted under the 2005 Note by failing to make the payment due on March 1, 2012, and all payments due thereafter.   CASALE MARBLE has further defaulted under the terms of the Cross Collateralization Agreement by virtue of the defaults of CREIG and METRO under their respective documents.

78.     Due to these defaults, PNC has elected and does now elect to accelerate and declare immediately due and owing the entire unpaid principal balance together with accrued interest due and owing on the 2005 Note.

79.     As of April 18, 2013, there is due and owing to PNC from CASALE MARBLE on the 2005 Note, the following amounts:

Principal Balance:

| | |
|---|---|
| Principal: | $2,633,842.92 |
| Interest at the Non-default Rate: | $  173,346.86 |
| Late Charges: | $     3,514.46 |
| Total Due: | $2,810,704.24 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Loan Documents.

Past Due Interest

| | |
|---|---|
| Principal: | $  141,721.80 |
| Interest at the Non-default Rate: | $     9,872.08 |
| Total Due: | $  151,593.88 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Loan Documents.

80.     Although demand has been made upon CASALE MARBLE to pay the amounts due and owing on the 2005 Note, CASALE MARBLE has failed to pay and continues to fail to do so, causing PNC to suffer damages in the amounts set forth in paragraph 79 above.

81.     Due to the failure of CASALE MARBLE to pay the 2005 Note as and when due, it was necessary for PNC to employ its undersigned attorneys and instruct the filing of this action, for which PNC will incur costs and expenses, including attorneys' fees, and which costs and expenses, including attorneys' fees, CASALE MARBLE is obligated to pay under the terms and conditions of the 2005 Note.

WHEREFORE, Plaintiff respectfully requests this Court to enter a Final Judgment in favor of Plaintiff and against the Defendant, CASALE MARBLE, for the principal amount of $2,775,564.72, together with any additional unpaid principal and/or advances, interest, late

1934736 v2

charges, costs and attorneys' fees, and to grant such other and additional relief as this Court may deem just and equitable.

## COUNT II
### (CONSOLIDATED RENEWAL PROMISSORY NOTE)

82.    PNC realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

83.    CASALE MARBLE has defaulted under the Consolidated Renewal Promissory Note by failing to make the payment due on March 1, 2012 and all payments due thereafter. CASALE MARBLE has further defaulted under the terms of the Cross Collateralization Agreement by virtue of the defaults of CREIG and METRO under their respective documents.

84.    Due to these defaults under the Consolidated Renewal Promissory Note, PNC has elected and does now elect to accelerate and declare immediately due and owing the entire unpaid principal balance together with accrued interest due and owing on the Consolidated Renewal Promissory Note.

85.    As of April 18, 2013, there is due and owing to PNC from CASALE MARBLE, on the Consolidated Renewal Promissory Note, the following amounts:

| | |
|---|---|
| Principal: | $1,030,631.18 |
| Interest at the Non-default rate: | $   67,559.45 |
| Total Due: | $1,098,190.63 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Loan Documents.

86.    Although demand has been made upon CASALE MARBLE to pay the amounts due and owing on the Consolidated Promissory Note, CASALE MARBLE has failed to pay and continues to fail to do so.

19

87.     Due to the failure of CASALE MARBLE to pay the Consolidated Promissory Note as and when due, it was necessary for PNC to employ its undersigned attorneys and instruct the filing of this action, for which PNC will incur costs and expenses, including attorneys' fees, and which costs and expenses, including attorneys' fees, CASALE MARBLE is obligated to pay under the terms and conditions of the Consolidated Promissory Note.

WHEREFORE, Plaintiff respectfully requests this Court to enter a Final Judgment in favor of Plaintiff and against the Defendant, CASALE MARBLE, in the principal amount of $1,030,631.18, together with any additional unpaid principal and/or advances, interest, late charges, costs and attorneys' fees, and to grant such other and additional relief as this Court may deem just and equitable.

## COUNT III
### (FORECLOSURE OF SECURITY INTEREST IN CASALE MARBLE PERSONALTY)

88.     PNC realleges and incorporates herein the allegations contained in paragraphs 1 75 above as though fully set forth herein.

89.     This is an action to foreclose a security interest in personal property located in Palm Beach County, Florida, and, upon information and belief, Lee County, Florida.

90.     The personal property constituting the 2005 Collateral, the First 2006 Collateral, the Second 2006 Collateral, the First 2007 Collateral, and the Second 2007 Collateral, and as further described in the 2005 Casale UCC's, the 2006 Casale UCC's, and the 2007 Casale UCC's, is now owned by CASALE MARBLE, which holds possession thereof (collectively, the "Casale Marble Personal Property").

91.     Due to the failure of CASALE MARBLE to make the payment due on March 1, 2012, and all payments due thereafter various, among other defaults, there is a default under the

20

1934736 v2

terms of the Casale Marble Loan Documents, and PNC is entitled to foreclose its security interest in the Casale Marble Personal Property.

92.    CASE may have or claim some interest in the Casale Marble Personal Property by virtue of his status as landlord for CASALE MARBLE at the 750 SW 17th Avenue location. Any such interest, however, is junior and inferior to that of Plaintiff.

WHEREFORE, Plaintiff demands judgment foreclosing its security interest in the Casale Marble Personal Property, and awarding such further relief as may be appropriate, including writs of possession and deficiency judgments.

**COUNT IV**
**(CASALE MARBLE GUARANTY BY CREIG)**

93.    PNC realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

94.    As a result of the defaults under the Casale Marble Loan Documents, CREIG is obligated to pay the amounts due and owing thereunder pursuant to the CREIG Guaranty.

95.    CREIG is liable for all indebtedness of CASALE MARBLE under the 2005 Note and the Consolidated Renewal Promissory Note by virtue of the CREIG Guaranty which states

> INDEBTEDNESS GUARANTEED. The Indebtedness guaranteed by this Guaranty includes any and all of Borrower's indebtedness to Lender and is used in the most comprehensive sense and means and includes any and all of Borrower's liabilities, obligations and debts to Lender, now existing or hereinafter incurred or created, including, without limitation, all loans, advances, interest, costs, debts, overdraft indebtedness, credit card indebtedness, lease obligations, other obligations, and liabilities of Borrower, or any of them, and any present or future judgments against Borrower, or any of them; and whether any such Indebtedness is voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, whether Borrower may be liable individually or jointly with others, or primarily or secondarily, or as guarantor or surety; whether recovery on the Indebtedness may be or may become barred or unenforceable against Borrower for any reason whatsoever; and whether the Indebtedness arises

from transactions which may be voidable on account of infancy, insanity, ultra vires, or otherwise.

96.     As of April 18, 2013, there is due and owing to PNC from CREIG on the 2005 Note and the Consolidated Renewal Promissory Note, the following amounts:

    (a)     On the 2005 Note:

| | |
|---|---|
| Principal: | $2,633,842.92 |
| Interest at the Non-default Rate: | $ 173,346.86 |
| Late Charges: | $     3,514.46 |
| Total Due: | $2,810,704.24 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Loan Documents.

    Past Due Interest

| | |
|---|---|
| Principal: | $  141,721.80 |
| Interest at the Non-default Rate: | $     9,872.08 |
| Total Due: | $  151,593.88 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Loan Documents.

    (b)     On the Consolidated Renewal Promissory Note:

| | |
|---|---|
| Principal: | $1,030,631.18 |
| Interest at the Non-default rate: | $    67,559.45 |
| Total Due: | $1,098,190.63 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Loan Documents.

    WHEREFORE, Plaintiff respectfully requests that this Court enter a Final Judgment in favor of Plaintiff and against Defendant CREIG for the principal amount of $3,806,195.90, together with any additional unpaid principal and/or advances, interest, late charges, costs and

attorneys' fees, and to grant such other and additional relief as this Court may deem just and equitable.

## COUNT V
### (CASALE MARBLE GUARANTY BY D. CASALE)

97.     PNC realleges and incorporates herein the allegations contained in paragraphs 1 75 above as though fully set forth herein.

98.     As a result of the defaults under the 2005 Note and the Consolidated Renewal Promissory Note, D. CASALE is obligated to pay the amounts due and owing thereunder pursuant to the 2005 D. CASALE Guaranty, the 2006 D. CASALE Guaranty, and the 2007 D. CASALE Guaranty.

99.     D. CASALE is liable for all indebtedness of CASALE MARBLE under the 2005 Note and the Consolidated Promissory Note by virtue of the 2005 D. CASALE Guaranty which states

> INDEBTEDNESS GUARANTEED.  The Indebtedness guaranteed by this Guaranty includes any and all of Borrower's indebtedness to Lender and is used in the most comprehensive sense and means and includes any and all of Borrower's liabilities, obligations and debts to Lender, now existing or hereinafter incurred or created, including, without limitation, all loans, advances, interest, costs, debts, overdraft indebtedness, credit card indebtedness, lease obligations, other obligations, and liabilities of Borrower, or any of them, and any present or future judgments against Borrower, or any of them; and whether any such Indebtedness is voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, whether Borrower may be liable individually or jointly with others, or primarily or secondarily, or as guarantor or surety; whether recovery on the Indebtedness may be or may become barred or unenforceable against Borrower for any reason whatsoever; and whether the Indebtedness arises from transactions which may be voidable on account of infancy, insanity, ultra vires, or otherwise.

23

100.   D. CASALE is further liable for all indebtedness of CASALE MARBLE under the 2005 Note and the Consolidated Renewal Promissory Note by virtue of the 2006 D. CASALE Guaranty and the 2007 D. CASALE Guaranty, which state

> CONTINUING GUARANTY.   This is a "Continuing Guaranty" under which Guarantor agrees to guarantee the full and punctual payment, performance and satisfaction of the indebtedness of Borrower to Lender, now existing or hereafter arising or acquired, on an open and continuing basis.   Accordingly, any payments made on the indebtedness will not discharge or diminish guarantor's obligations and liability under this Guaranty for any remaining and succeeding indebtedness even when all or part of the outstanding indebtedness may be a zero balance from time to time.

101.   As of April 18, 2013, there is due and owing to PNC from D. CASALE, the following amounts:

(a)   On the 2005 Note:

| | |
|---|---|
| Principal: | $2,633,842.92 |
| Interest at the Non-default Rate: | $ 173,346.86 |
| Late Charges: | $     3,514.46 |
| Total Due: | $2,810,704.24 |

Plus interest which continues to accrue at the Non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Loan Documents.

Past Due Interest

| | |
|---|---|
| Principal: | $  141,721.80 |
| Interest at the Non-default Rate: | $     9,872.08 |
| Total Due: | $  151,593.88 |

Plus interest which continues to accrue at the Non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Loan Documents.

(b)   On the Consolidated Promissory Note:

| | |
|---|---|
| Principal: | $1,030,631.18 |

24

| Interest at the Non-default rate: | $   67,559.45 |
| --- | --- |
| Total Due: | $1,098,190.63 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Loan Documents.

WHEREFORE, Plaintiff respectfully requests that this Court enter a Final Judgment in favor of Plaintiff and against the Defendant, D. CASALE the principal amount of $3,806,195.90, together with any additional unpaid principal and/or advances, interest, late charges, costs and attorneys' fees, and to grant such other and additional relief as this Court may deem just and equitable.

## COUNT VI
### (ACCOUNTING)

102.    PNC reasserts and realleges and incorporates herein the allegations contained in paragraphs 1 through 43, 66 through 68 and 73 through 75 above as though fully set forth herein.

103.    This is an action for equitable relief in the form of accounting, as provided by Florida law, against CASALE MARBLE.

104.    Due to the nature of the business operations of the parties CASALE MARBLE is in possession of information pertinent to the rights of PNC under the Casale Marble Loan Documents and PNC is in need of an accounting.

105.    Absent a full accounting by CASALE MARBLE, PNC is unable to know the status of the Casale Marble Personal Property, which serves as collateral for CASALE MARBLE's obligations to PNC.

106.    Pursuant to the Casale Marble Loan Documents, PNC has a right to know the status of its collateral.

107.    CASALE MARBLE'S accounts are complicated and therefore justify an accounting.

25

108.   Equity demands that CASALE MARBLE provide an accounting to PNC.

109.   PNC has retained the undersigned attorneys to enforce its rights under the Loan Documents and has agreed to pay a reasonable fee for their serves.  PNC is entitled to recover from CASALE MARBLE its attorney's fees and costs incurred in this litigation.

WHEREFORE, Plaintiff, PNC, respectfully requests this Court order CASALE MARBLE to provide an accounting of CASALE MARBLE to Plaintiff, award Plaintiff its attorneys' fees and costs, and such other relief as this Court deems just and equitable.

## COUNT VII
## (CREIG PROMISSORY NOTE)

110.   Plaintiff realleges and incorporates herein the allegations contained in  paragraphs 1 through 14, 44 through 51 and 66 through 75 above as though fully set forth herein.

111.   CREIG has defaulted under the CREIG Note by failing to make the payment due on March 1, 2012 and all payments due thereafter and by failing to pay the 2012 real property taxes on the property securing the CREIG Loan.  CREIG has further defaulted under the terms of the Cross Collateralization Agreement by virtue of the defaults of CASALE MARBLE and METRO under their respective loan documents.

112.   Due to these defaults, PNC has elected and does now elect to accelerate and declare immediately due and owing the entire unpaid principal balance together with accrued interest due and owing on the CREIG Note.

113.   As of April 18, 2013, there is due and owing to PNC from CREIG on the  CREIG Note, the following amounts:

1934736 v2

| | |
|---|---|
| Principal: | $2,706,352.04 |
| Interest at the Non-default rate: | $   173,725.16 |
| Late Charges: | $       1,597.76 |
| Total Due: | $2,881,674.96 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the CREIG Loan Documents.

114.    Although demand has been made on CREIG to pay the amounts due and owing on the CREIG Note, CREIG has failed to pay and continues to fail to do so.

115.    Due to the failure of CREIG to pay the CREIG Note as and when due, it was necessary for PNC to employ its undersigned attorneys and instruct the filing of this action, for which PNC will incur costs and expenses, including attorneys' fees, and which costs and expenses, including attorneys' fees, CREIG is obligated to pay under the terms and conditions of the CREIG Note.

WHEREFORE, Plaintiff respectfully requests this Court to enter a Final Judgment in favor of Plaintiff and against the Defendant, CREIG, for the principal amount of $2,706,352.04, together with any additional unpaid principal and/or advances, interest, late charges, costs and attorneys' fees, and to grant such other and additional relief as this Court may deem just and equitable.

## COUNT VIII
### (MORTGAGE FORECLOSURE – DELRAY REAL PROPERTY)

116.    Plaintiff realleges and incorporates herein the allegations in paragraphs 1 through 75 above as though fully set forth herein.

117.    This is an action to foreclose a mortgage on real property situated, lying and located in Palm Beach County, Florida, more particularly described as:

**Lots 1 to 21, inclusive, Block 1, Delray Heights Extension Section B, according to the map or plat thereof as recorded in**

1934736 v2

**Plat Book 27, Page 10, Public Records of Palm Beach County, Florida.**

(the "Delray Real Property")

118.   CREIG is the record title holder to the Delray Real Property.

119.   CREIG has defaulted under the CREIG Loan Documents by failing to make the payment due on March 1, 2012 and all payments due thereafter, by failing to pay the 2012 real property taxes due on the Delray Real Property and pursuant to the terms of the Cross Collateralization Agreement by virtue of the defaults of CASALE MARBLE and METRO under their respective loan documents, and Plaintiff is entitled to foreclose the CREIG Mortgage upon the Delray Real Property.

120.   CASALE MARBLE may have or claim some interest in the Delray Real Property by virtue of an unrecorded lease.

121.   The UNKNOWN TENANTS of the Delray Real Property may have or claim some interest in the Delray Real Property as tenants thereon, but any such interest is junior and inferior to that of PNC's mortgage.

122.   Due to the aforesaid defaults by CREIG, it was necessary for Plaintiff to employ the undersigned attorneys and instruct the filing of this action for which Plaintiff will incur costs and expenses, including abstract expenses, attorneys' fees, court costs, payment of taxes, etc., which costs and expenses are to be paid by CREIG to Plaintiff under the terms and conditions of the CREIG Mortgage.

WHEREFORE, Plaintiff demands judgment foreclosing the CREIG Mortgage, directing the Clerk of the Court to sell the Delray Real Property at a foreclosure sale pursuant to Section 45.031, Florida Statutes and for such other and additional relief as this Court may deem just and equitable.

1934736 v2

## COUNT IX
### (MORTGAGE FORECLOSURE – TENNIS REAL PROPERTY)

123.    Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

124.    This is an action to foreclose a mortgage on real property situated, lying and located in Palm Beach County, Florida, more particularly described as:

> **Lot 10, Block 7, Boca Raton Bath and Tennis Club, according to the map or plat thereof as recorded in Plat Book 32, Page 20, Public Records of Palm Beach County, Florida.**

(the "Tennis Real Property).

125.    D. CASALE and S. CASALE are the record title holders to the Tennis Real Property.

126.    CREIG has defaulted under the CREIG Loan Documents by failing to make the payment due on March 1, 2012, and all payments due thereafter, by failing to pay the 2012 real property taxes due on the Tennis Real Property, and pursuant to the terms of the Cross Collateralization Agreement by virtue of the defaults of CASALE MARBLE and METRO under their respective loan documents, and Plaintiff is entitled to foreclose its mortgage upon the Tennis Real Property.

127.    BOCA RATON may have or claim some interest in the Tennis Real Property as a lienholder, but any such interest is junior and inferior to that of the CREIG Mortgage.

128.    The UNKNOWN TENANTS of the Tennis Real Property may have or claim some interest in the Tennis Real Property as tenants thereon, but any such interest is junior and inferior to that of the CREIG Mortgage.

129.    Due to the aforesaid defaults by CREIG, it was necessary for Plaintiff to employ the undersigned attorneys and instruct the filing of this action for which Plaintiff will incur costs

1934736 v2

and expenses, including abstract expenses, attorneys' fees, court costs, payment of taxes, etc., which costs and expenses are to be paid by CREIG to Plaintiff under the terms and conditions of the Mortgage.

**WHEREFORE,** Plaintiff demands judgment foreclosing the CREIG Mortgage, directing the Clerk of the Court to sell the Tennis Real Property at a foreclosure sale pursuant to Section 45.031, Florida Statutes and for such other and additional relief as this Court may deem just and equitable.

## COUNT X
### (MORTGAGE FORECLOSURE – LA CASA REAL PROPERTY)

130.     Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

131.     This is an action to foreclose a mortgage on real property situated, lying and located in Palm Beach County, Florida, more particularly described as:

> **Lot 25, Plat 1 of La Casa, a P.U.D., according to the map or plat thereof as recorded in Plat Book 58, Page 187, Public Records of Palm Beach County, Florida.**

(the "La Casa Real Property").

132.     D. CASALE is the record title holder to the La Casa Real Property.

133.     CREIG has defaulted under the CREIG Loan Documents by failing to make the payment due on March 1, 2012 and all payments due thereafter, by failing to pay the 2012 real property taxes due on the La Casa Real Property, and pursuant to the terms of the Cross Collateralization Agreement by virtue of the defaults of CASALE MARBLE and METRO under their respective loan documents, and Plaintiff is entitled to foreclose the CREIG Mortgage upon the La Casa Real Property.

1934736 v2

134.    LA CASA may have or claim some interest in the La Casa Real Property as a lienholder, but any such interest is junior and inferior to that of the CREIG Mortgage.

135.    BEL-AIRE may have or claim some interest in the La Casa Real Property as a lienholder, but any such interest is junior and inferior to that of the CREIG Mortgage.

136.    The UNKNOWN TENANTS of the La Casa Real Property may have or claim some interest in the La Casa Real Property as tenants thereon, but any such interest is junior and inferior to that of PNC's mortgage.

137.    Due to the aforesaid defaults by CREIG, it was necessary for Plaintiff to employ the undersigned attorneys and instruct the filing of this action for which Plaintiff will incur costs and expenses, including abstract expenses, attorneys' fees, court costs, payment of taxes, etc., which costs and expenses are to be paid by CREIG to Plaintiff under the terms and conditions of the CREIG Mortgage.

WHEREFORE, Plaintiff demands judgment foreclosing the CREIG Mortgage, directing the Clerk of the Court to sell the La Casa Real Property at a foreclosure sale pursuant to Section 45.031, Florida Statutes and for such other and additional relief as this Court may deem just and equitable.

## COUNT XI
## (FORECLOSURE OF SECURITY INTEREST IN CREIG PERSONALTY)

138.    PNC realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

139.    This is an action to foreclose a security interest in personal property in Palm Beach County, Florida.

140.    The personal property described in the CREIG Mortgage and the CREIG UCC's is now owned by CREIG, which holds possession thereof (the "CREIG Personal Property").

31

141. The Defendants may claim some interest or interests in said CREIG Personal Property, but any such interests are junior, inferior, and subordinate to Plaintiff's interests therein

142. Due to CREIG's defaults, PNC is entitled to foreclose its security interest in the CREIG Personal Property.

WHEREFORE, Plaintiff demands judgment foreclosing its security interest in the CREIG Personal Property, as described in the CREIG Mortgage and as further described in CREIG UCC's, and awarding such further relief as may be appropriate, including writs of possession and deficiency judgments.

## COUNT XII
### (FORECLOSURE OF SECURITY INTEREST IN CREIG RENTS)

143. PNC realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

144. This is an action to foreclose a security interest in personal property, consisting of leases and rents, in Palm Beach County, Florida (the "CREIG Rents").

145. The CREIG Rents are owned by CREIG who holds possession thereof.

146. The Defendants may claim some interest or interests in said CREIG Rents, but any such interests are junior, inferior, and subordinate to Plaintiff's interests therein.

147. Due to CREIG's defaults, PNC is entitled to foreclose its security interest in the CREIG Rents pursuant to the CREIG Assignment of Rents.

WHEREFORE, Plaintiff demands judgment foreclosing its security interest in the CREIG Rents, as described in the CREIG Assignment of Rents, and awarding such further relief as may be appropriate.

1934736 v2

## COUNT XIII
### (CREIG GUARANTY BY D. CASALE)

148.    PNC realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

149.    As a result of the defaults under the CREIG Loan Documents, D. CASALE is obligated to pay the amounts due and owing thereunder pursuant to the CREIG-Casale Guaranty.

150.    As of April 18, 2013, there is due and owing to PNC from D. CASALE on the CREIG Loan, the following:

| | |
|---|---|
| Principal: | $2,706,352.04 |
| Interest at the Non-default Rate: | $  173,725.16 |
| Late Charges: | $      1,597.76 |
| Total Amount Due: | $2,881,674.96 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the CREIG Loan Documents.

WHEREFORE, Plaintiff respectfully requests that this Court enter a Final Judgment in favor of Plaintiff and against the Defendant, D. CASALE for the principal amount of $2,706,352.04, plus interest, costs and attorneys' fees, and to grant such other and additional relief as this Court may deem just and equitable.

## COUNT XIV
### (FIRST METRO NOTE)

151.    PNC realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

152.    METRO has defaulted under the First Metro Note by failing to make the payment due on March 1, 2012 and all payments due thereafter and by failing to pay the 2012 real property taxes on the property securing the First Metro Loan.  METRO has further defaulted under the terms of the Cross Collateralization Agreement by virtue of the defaults of CREIG and CASALE MARBLE under their respective documents.

33

1934736 v2

153.    Due to the default of METRO under the First Metro Note, PNC had elected and does now elect to accelerate and declare immediately due and owing the entire unpaid principal balance together with accrued interest due and owing on the First Metro Note.

154.    As of April 18, 2013, there is due and owing to PNC from METRO on the First Metro Note, the following amounts:

| | | |
|---|---|---|
| Principal: | $ | 1,076,717.36 |
| Interest at the Non-default rate: | $ | 69,116.17 |
| Late Charges: | $ | 55,907.42 |
| Total due on Loan No.605420702: | $ | 1,201,740.95 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Metro Loan Documents.

155.    Although demand has been made on METRO to pay the amounts due and owing on the First Metro Note, METRO has failed to pay and continues to fail to do so.

156.    Due to the failure of METRO to pay the First Metro Note as and when due, it was necessary for PNC to employ the undersigned attorneys and instruct the filing of this action, for which PNC will incur costs and expenses, including attorneys' fees, and which costs and expenses, including attorneys' fees, METRO is obligated to pay under the terms and conditions of the First Metro Note.

WHEREFORE, Plaintiff respectfully requests that this Court enter a Final Judgment in favor of Plaintiff and against the Defendant, METRO, for the principal amount of $1,076,717.36, together with any additional unpaid principal and/or advances, interest, late charges, costs and attorneys' fees and to grant such other and additional relief as this Court may deem just and equitable.

1934736 v2

## COUNT XV
## (SECOND METRO NOTE)

157.   PNC realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

158.   METRO has defaulted under the Second Metro Note by failing to make the payment due on March 1, 2012 and all payments due thereafter and by failing to pay the 2012 real property taxes on the property securing the Second Metro Loan.   METRO has further defaulted under the terms of the Cross Collateralization Agreement by virtue of the defaults of CREIG and CASALE MARBLE under their respective documents.

159.   Due to the default of METRO under the Second Metro Note, PNC had elected and does now elect to accelerate and declare immediately due and owing the entire unpaid principal balance together with accrued interest due and owing on the Second Metro Note.

160.   As of April 18, 2013, there is due and owing to PNC from METRO on the Second Metro Note, the following amounts:

| | | |
|---|---|---|
| Principal: | $ | 725,672.36 |
| Interest at the Non-default Rate: | $ | 46,589.52 |
| Late Charges: | $ | 940.74 |
| Total due on Loan No. 605420718: | $ | 773,202.62 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Metro Loan Documents.

161.   Due to the failure of METRO to pay the Second Metro Note as and when due, it was necessary for PNC to employ the undersigned attorneys and instruct the filing of this action, for which PNC will incur costs and expenses, including attorneys' fees, and which costs and expenses, including attorneys' fees, METRO is obligated to pay under the terms and conditions of the Second Metro Note.

1934736 v2

WHEREFORE, Plaintiff respectfully requests that this Court enter a Final Judgment in favor of Plaintiff and against the Defendant, METRO, for the principal amount of $725,672.36, together with any additional unpaid principal and/or advances, interest, late charges, costs and attorneys' fees and to grant such other and additional relief as this Court may deem just and equitable.

**COUNT XVI**
**(MORTGAGE FORECLOSURE – METRO REAL PROPERTY)**

162.     Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

163.     This is an action to foreclose the First Metro Mortgage and the Second Metro Mortgage, which mortgages are on real property situated, lying and located in Lee County, Florida (the "Metro Real Property"), more particularly described on the attached **Exhibit "XX"**.

164.     METRO is the record title holder to the Metro Real Property.

165.     METRO has defaulted under the METRO Loan Documents by failing to make the payment due on March 1, 2012 and all payments due thereafter, by failing to pay the 2012 real property taxes due on the Metro Real Property, CASALE MARBLE has further defaulted under the terms of the Cross Collateralization Agreement by virtue of the defaults of CREIG and METRO under their respective documents, and Plaintiff is entitled to foreclose the First Metro Mortgage and the Second Metro Mortgage upon the Metro Real Property.

166.     CASALE MARBLE may have or claim some interest in the Metro Real Property by virtue of an unrecorded lease, but any such interest is junior and inferior to that of the First Metro Mortgage.

167.     TRITON may have or claim some interest in the Metro Real Property as tenants thereon, but any such interest is junior and inferior to that of the First Metro Mortgage.

1934736 v2

168.    The UNKNOWN TENANTS of the Metro Real Property may have or claim some interest in the Metro Real Property as tenants thereon, but any such interest is junior and inferior to that of PNC's mortgage.

169.    Due to the aforesaid defaults, it was necessary for Plaintiff to employ the undersigned attorneys and instruct the filing of this action for which Plaintiff will incur costs and expenses, including abstract expenses, attorneys' fees, court costs, payment of taxes, etc., which costs and expenses are to be paid by METRO to Plaintiff under the terms and conditions of the First Metro Mortgage and the Second Metro Mortgage.

WHEREFORE, Plaintiff demands judgment foreclosing the First Metro Mortgage and the Second Metro Mortgage, directing the Clerk of the Court to sell the Metro Real Property at a foreclosure sale pursuant to Section 45.031, Florida Statutes, and for such other and additional relief as this Court may deem just and equitable.

**COUNT XVII**
**(FORECLOSURE OF SECURITY INTEREST IN METRO RENTS)**

170.    PNC realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

171.    This is an action to foreclose a security interest in personal property, consisting of leases and rents, in Lee County, Florida (the "Metro Rents").

172.    The Metro Rents are owned by Metro who holds possession thereof.

173.    The Defendants may claim some interest or interests in said Metro Rents, but any such interests are junior, inferior, and subordinate to Plaintiff's interests therein.

174.    Due to METRO's defaults, PNC is entitled to foreclose its security interest in the Metro Rents pursuant to the First Metro Assignment and the Second Metro Assignment.

1934736 v2

WHEREFORE, Plaintiff demands judgment foreclosing its security interest in the Metro Rents, as described in the First Metro Assignment and the Second Metro Assignment, and awarding such further relief as may be appropriate.

### COUNT XVIII
### (BREACH OF THE METRO CASALE GUARANTY)

175.    PNC realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

176.    As a result of the defaults under the First Metro Note and the Second Metro Note, D. CASALE is obligated to pay the amounts due and owing thereunder pursuant to the METRO-D. CASALE Guaranty.

177.    As of April 28, 2013, there is due and owing to PNC from D. CASALE on the First Metro Note and the Second Metro Note, the following:

| | | |
|---|---|---|
| Principal: | $ | 1,076,717.36 |
| Interest at the Non-default rate: | $ | 69,116.17 |
| Late Charges: | $ | 55,907.42 |
| Total due on Loan No.605420702: | $ | 1,201,740.95 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Metro Loan Documents.

| | | |
|---|---|---|
| Principal: | $ | 725,672.36 |
| Interest at the Non-default Rate: | $ | 46,589.52 |
| Late Charges: | $ | 940.74 |
| Total due on Loan No. 605420718: | $ | 773,202.62 |

Plus interest which continues to accrue at the non-default rate, interest at the default rate, attorneys' fees and other costs incurred by PNC under the Metro Loan Documents.

WHEREFORE, Plaintiff respectfully requests that this Court enter a Final Judgment in favor of Plaintiff and against the Defendant, D. CASALE, in the principal amount of $1,802,389.72, plus interest, costs and attorneys' fees and to grant such other and additional relief as this Court may deem just and equitable.

1934736 v2

## COUNT XIX
### (INJUNCTIVE RELIEF)

178.    PNC realleges and incorporates herein the allegations contained in paragraphs 1 through 75 above as though fully set forth herein.

179.    This is an action for injunctive relief.

180.    Despite its defaults and general insolvency, CASALE MARBLE continues to sell portions of the Casale Marble Personal Property without remitting any payments to Plaintiff.

181.    CASALE MARBLE is dissipating and continues to dissipate Plaintiff's collateral.

182.    Courts regularly grant injunctive relief to secure and protect security interests in personal property from the threat of dissipation.

183.    The likelihood of irreparable harm to Plaintiff is great because, absent injunctive relief, CASALE MARBLE will continue to dissipate Plaintiff's security interests in the Casale Marble Personal Property.

184.    The Casale Marble Personal Property is located on premises owned by CREIG and METRO, affiliates of CASALE MARBLE.

185.    There is little harm to CASALE MARBLE, CREIG, or METRO in granting injunctive relief, which only would require Defendant to do that which it is required to do under the Loan Documents, *i.e.*, preserve Plaintiff's collateral after default.

186.    The public interest is furthered by the granting of a temporary restraining order and further injunctive relief as the public has an interest in the enforcement of private, commercial contracts.

187.    Furthermore, if notice is given to the Defendants of the pendency of this action, the Casale Marble Personal Property may be further dissipated before a motion is heard.  Once dissipation has occurred, recovery of the collateral is all but impossible.

1934736 v2

188.    Plaintiff, upon this Court's request, will post a bond.

WHEREFORE, Plaintiff requests an injunction against CASALE MARBLE, CREIG, and

METRO, and their agents, officers, subsidiaries, assigns, banking institutions, and related

entities, ordering them to not use, sell, transfer, conceal, or otherwise dispose of the Casale

Marble Personal Property until further order of this Court or until payment to Plaintiff of the

indebtedness due under the Loan Documents, plus appropriate interest, fees, and costs, by

cashier's check or certified check, at which time the injunction would then be dissolved, together

with such other additional relief this Court deems just and appropriate

DATED this ___ day of May, 2013.


Respectfully submitted,

**BURR & FORMAN LLP**
**Attorneys for Plaintiff**
200 South Orange Avenue
Suite 800
Orlando, FL  32801
Phone:  (407) 540-6607
Fax:  (407) 540-6601
E-mail:  ddpowell@burr.com
E-mail:  mnardella@burr.com


By: _____
Denise D. Dell-Powell, Esq.
Florida Bar No.: 0890472
Michael A. Nardella, Esq.
Florida Bar No.:  51265

40

**VERIFICATION**

STATE OF FLORIDA
COUNTY OF LEE

Before me, the undersigned authority, duly authorized to administer oaths and take acknowledgments, personally appeared Wendy Nelson, who, after being first duly sworn, deposes and says that she is Vice President for the Plaintiff, PNC Bank, National Association ("PNC"), and that in such capacity, she has authority to make this verification on behalf of Plaintiff; that the affiant, in her capacity as Vice President, has access to and control over the books and records kept and maintained by Plaintiff in regard to the loan documents described in this Verified Complaint; that the affiant has read the foregoing Verified Complaint and states that the facts and matters alleged and contained therein are true and correct; and that the affiant has made this affidavit either upon her own personal knowledge of the facts involved or based upon the books and records customarily kept and maintained by Plaintiff in regard to the loan made by PNC as alleged in the Verified Complaint.

_Wendy M Nelson_
AFFIANT

STATE OF FLORIDA                    )
                                    ) ss:
COUNTY OF LEE                       )

The foregoing instrument was sworn to and subscribed before me this /0 day of May, 2013, by Wendy Nelson, as Vice President of PNC.  She is personally known to me or has produced _FL Driver License_ (type of identification) as identification.

_Linda H Fox_
NOTARY PUBLIC, STATE OF FLORIDA
_Linda G. Fox_
(Print, Type or Stamp Commissioned Name of Notary Public)

LINDA G. FOX
Notary Public · State of Florida
My Comm. Expires Aug 10, 2013
Commission # DD 913869
Bonded Through National Notary Assn.

1934736 v1                                   41